# In the Iowa Supreme Court

No. 22–0023

Submitted October 9, 2024—Filed January 24, 2025

**State of Iowa,**

Appellee,

vs.

**Tyre Dewayne Brown,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Odell G. McGhee II, district associate judge.

The defendant seeks further review of a court of appeals decision affirming the district court ruling that denied his motion to suppress evidence. **Court of Appeals Decision Affirmed; District Court Suppression Ruling Affirmed.**

McDermott, J., delivered the opinion of the court, in which all justices joined.

Martha J. Lucey, State Appellate Defender, and Ashley Stewart (until withdrawal), Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Nicholas E. Siefert, Assistant Attorney General, for appellee.

**McDermott, Justice.**

An officer on patrol stopped a vehicle for a traffic infraction after the officer received word that the vehicle's occupants may have participated in a drug sale. After a preliminary visit with the driver to gather documents, the officer returned to his cruiser and waited for backup. Once other officers arrived, they removed the occupants (the driver and a passenger), walked a drug-sniffing dog around the vehicle, and searched the interior. The search turned up a gun. The passenger, Tyre Brown, admitted the gun was his. The State charged him with unlawful possession of a firearm. Brown challenged the search, arguing that the officer unlawfully seized him by prolonging the stop beyond the time necessary to address the traffic infraction. We must decide whether the officer's delay violated Brown's constitutional rights.

The events begin with Des Moines Police Officer Austin Finley surveilling a residence as part of a drug trafficking investigation. Finley saw a man leave the residence, place a backpack in the back seat of a vehicle, and get behind the wheel. Brown, meanwhile, got into the front passenger seat. As they drove off, Finley followed in an unmarked car. At some point, Finley saw the vehicle stop for what he believed to be a street-level drug transaction. As Finley continued following, he saw the vehicle make a left turn and, as it did, noticed that it crossed the yellow center line too early. Although Finley believed he had a lawful basis to stop the vehicle, because he was in plainclothes, he preferred that an officer in a marked squad car do it. Finley asked Officer Dao Meunsaveng, who was on patrol in the vicinity with his K-9, for assistance. Meunsaveng's body camera recorded the following interaction.

After pulling the vehicle over, Meunsaveng walked to the driver's window. He received the driver's license, vehicle registration, and various rental documents (because the vehicle was a rental). Meunsaveng asked the driver

about insurance on the rental and where they were traveling. After answering, the driver asked the officer for his ticket. Meunsaveng took the driver's documents back to his squad car. Once there, Meunsaveng reported over the police radio: "Just to let you guys know, he is nervous. He's anxious. He just wants his ticket. So I'm going to wait until another unit gets here and then I'll pull him out of the car and do the dog." A little while later, Meunsaveng radioed with an officer who was on his way to provide backup, telling the officer, "As soon as you get here, we're going to pull the driv—the occupants out of the car, then I want you to start running him and writing the ticket while I run Bero," referring to the K-9.

As Meunsaveng continued to wait for a backup officer to arrive, he explained to the arriving officers his plan to get the driver out of the vehicle so he could search with the K-9. Meunsaveng said, "I'm going to pretend like, 'Hey, I'm going to get you a ticket. I want you to come out here and sign the ticket.'" Once out of the vehicle, the driver would wait with a backup officer while the backup officer wrote the traffic ticket. Meunsaveng, meanwhile, would get the passenger out of the vehicle and then take the K-9 around the car to sniff.

When backup arrived, Meunsaveng put the ruse into action. But when Meunsaveng returned to the vehicle and asked the driver to get out to "sign the ticket," the driver questioned why he needed to exit. The situation briefly escalated as Meunsaveng ordered the driver to roll down the window and get out as the driver protested that he'd not been told why he'd been pulled over. The driver soon relented and exited, but he continued to protest. Meunsaveng handcuffed the driver and moved him away from the vehicle. One of several plainclothes officers now at the scene told the driver that he smelled like marijuana. The driver denied smoking marijuana. Another plainclothes officer,

meanwhile, asked Brown to exit the vehicle, which he did. They stood outside the vehicle, away from the others.

Meunsaveng then retrieved the K-9 from his squad car and began searching around the vehicle. He reported that the dog alerted for drugs, at which point the officers opened the vehicle's doors and began searching. Meunsaveng, after opening a rear door, said that he smelled marijuana. The officers found a gun under the front passenger seat where Brown had been sitting. Brown admitted at the scene that the gun was his. Brown was charged with unlawful possession of a firearm under Iowa Code § 724.4(1) (2021).

Brown filed a motion to suppress the evidence from the search, arguing that the traffic stop violated his rights under both the Iowa and United States Constitutions by unconstitutionally extending the duration and scope of the stop. The State resisted. Finley and Meunsaveng testified at the suppression hearing. The district court denied Brown's motion to suppress. Having lost the motion, Brown stipulated to a trial on the minutes of testimony. The district court found him guilty. Brown appealed, challenging the denial of his motion to suppress.

We transferred the case to the court of appeals. The court of appeals affirmed the district court's ruling. First, it concluded that extending the stop was permissible under the shared-knowledge doctrine, which presumes that one officer's knowledge, when acting in concert with others, is shared by the others. As a result, Finley's belief that he'd witnessed a potential drug transaction could be accorded to Meunsaveng for Meunsaveng to extend the stop. Second, the court of appeals found that Meunsaveng had smelled marijuana when he first went to the driver's window, permitting him to extend the stop to investigate this separate criminal activity learned during the traffic stop. Brown sought further review, which we granted.

Preparing the record in this appeal has proved complicated. The court reporter at the suppression hearing, who ordinarily would create the hearing transcript, died before the transcript could be prepared. Other reporters assigned to prepare the transcript in her place were unable to do so. Lacking a record from the suppression hearing, Brown filed a motion requesting a remand to the district court to recreate the record of the suppression hearing under Iowa Rule of Appellate Procedure 6.806 (2022). This rule permits a party to file a statement describing the evidence "prepared from the best available means, including the party's recollection," with the opposing party permitted to file objections or proposed amendments to the other party's statement within ten days. Iowa R. App. P. 6.806(1)–(2). The district court must settle the discrepancies between the submitted statement of the proceedings and the objections and then approve a final version of the statement. *Id.* at 6.806(3). We granted the motion for remand to recreate the hearing record.

On remand, Brown filed a statement of the evidence. The district court approved Brown's statement without the State having filed any objection, and the appeal continued. But the State shortly after filed an objection to Brown's statement, noting that the State's deadline to file an objection had not passed when the district court approved Brown's statement. The State moved for another remand to allow the district court to reconsider its approval of Brown's statement of the evidence in light of the State's objection. We granted the remand request for the district court to settle the objection to the statement of the evidence.

On remand, the district court sustained the State's objection and amended the earlier order approving Brown's statement to include the State's objection. The district court also included in the record a police report introduced at the suppression hearing. But the district court judge tasked with addressing the

State's objection on remand was not the same judge who presided at the suppression hearing and thus never heard the evidence presented at the suppression hearing.

Back on appeal, Brown requested another remand, arguing that the State, although having provided objections to Brown's statement, had not provided its own statement of the evidence at the suppression hearing. Brown contended that the original judge presiding at the suppression hearing failed to reconcile the State's objection with Brown's statement and failed otherwise to provide written findings to support the suppression ruling. The State agreed with these points, and we thus granted another limited remand, this time directing the State's trial counsel to file a statement with the State's version of the suppression hearing and for the original judge—the one who presided at the suppression hearing—to reconcile the competing statements filed by the parties.

On remand, the State provided its own recreation of the suppression record. The district court's order stated that the parties' separate statements recreating the hearing "are basically congruent." The order goes on to list "additional findings and conclusions of law" from the suppression hearing. These additional findings included, among other things, the following:

> Law enforcement was conducting a narcotic investigation of [the driver], saw him place a backpack inside the back of the [vehicle] and also saw him engage in a purported narcotic purchase/s[ale] on the street while [Brown] was present. They decided to conduct a stop of the vehicle but wanted to wait until a traffic violation was committed before stopping the [vehicle]. [The driver] was observed going left of center and Meunsaveng was notified to stop the vehicle.

Brown argues that the district court's conclusion that the parties' statements were "basically congruent" overlooks an issue in hot dispute: Whether Meunsaveng smelled marijuana when he initially spoke with the driver to create a separate basis to extend the stop for further investigation. Brown's

statement of the evidence recites that Officer Meunsaveng never mentioned smelling marijuana to the occupants of the vehicle, the dispatch operator, or in his initial approach to any of his fellow officers, but only that at some undetermined point, "he smelled a 'weak odor' of marijuana." Brown's statement further noted that the minutes of testimony said nothing about Meunsaveng smelling marijuana coming from the vehicle during his initial approach. The State's recreation of the hearing stated that "Officer Meunsaveng testified that *upon his initial interaction* with the vehicle's occupants, he smelled what he knew (based on his training and experience as a law enforcement officer) to be the odor of [m]arijuana coming from the interior of the vehicle . . . ." (Emphasis added.) The State argues that the strength of the odor was so palpable that a different officer can be heard on the bodycam telling the driver outside the vehicle that he smelled like marijuana.

On this unresolved question, the best evidence in our record is the bodycam video, to which both parties point us. Despite describing on the police radio other details from his initial encounter—that the driver is "nervous" and "anxious" and "just wants his ticket"—Meunsaveng never mentions the odor of marijuana during or immediately after his initial interactions with the driver. He only does so much later, after the occupants have been removed from the vehicle, the drug dog has sniffed around the vehicle and alerted for drugs, and Meunsaveng has entered with other officers to search the interior. On this record, the State has not established that Meunsaveng smelled marijuana in his initial interaction before he delayed the stop to wait for the other officers to arrive. If the smell of marijuana during Meunsaveng's initial interaction had been the only basis to extend this stop, Brown's claim of error in the suppression ruling might pan out. *See State v. Arrieta*, 998 N.W.2d 617, 620 (Iowa 2023) ("As a general matter, unless an officer has reasonable suspicion that a vehicle contains drugs,

an officer who otherwise lawfully stops a vehicle cannot detain the vehicle beyond the purpose for the stop to conduct a drug dog sniff.").

But this doesn't end the analysis. When Finley was following the vehicle, he saw the vehicle's occupants engage in what appeared to be a street-level drug transaction. Reasonable suspicion exists when an officer witnesses what, according to the officer's training and experience, they believe to be a hand-to-hand drug transaction. *State v. Baker*, 925 N.W.2d 602, 612 (Iowa 2019). The observation of the potential drug transaction supplied at least reasonable suspicion for an investigatory stop.

Although Meunsaveng himself did not observe the potential drug transaction, "the knowledge of one peace officer, acting in concert with other peace officers, is presumed to be shared by all." *Rife v. D.T. Corner, Inc.*, 641 N.W.2d 761, 770 (Iowa 2002). The shared-knowledge doctrine allows one officer with knowledge about criminal activity to order another officer to act on that knowledge. *State v. Thornton*, 300 N.W.2d 94, 97 (Iowa 1981). Although courts will examine whether the officer that provided the information or order had sufficient facts to create reasonable suspicion or probable cause, *see* 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.5(b), at 333–34 (6th ed. 2020), there is no doubt that Finley's communication about observing a drug transaction justified Meunsaveng's wait for backup before further investigating.

The parties dispute the order of Finley's call to Meunsaveng and the potential drug transaction Finley allegedly observed. Brown's statement of evidence asserts that Finley testified that his call to Meunsaveng occurred *before* the transaction and thus that Finley lacked the information necessary for Meunsaveng to have reasonable suspicion to prolong the stop. The State's

statement of evidence asserts that Finley testified to calling Meunsaveng *after* witnessing both the drug transaction and the traffic violation.

The district court, having heard the testimony of both Finley and Meunsaveng at the suppression hearing, agreed with the State. In its order reconciling the parties' statements, the district court recited findings that Finley "saw [the driver] engage in a purported narcotic purchase/s[ale] on the street while [Brown] was present." No video footage or other evidence in the record contradicts this finding. On the contrary, based on Meunsaveng's bodycam video, even before his initial interaction with the driver, Meunsaveng was already coordinating with backup officers and planning the K-9 search—efforts that would make no sense if he were merely looking into a left-turn violation. Indeed, if Brown's recitation about the timing were correct, Meunsaveng would not have known about the traffic violation Finley observed, and yet Brown does not contest the basis for the initial stop. Under the shared-knowledge doctrine, Finley's knowledge of the drug transaction becomes actionable by Meunsaveng, and Meunsaveng thus did not improperly extend the stop as he waited for backup to arrive to assist him with it at the scene.

The extension of the stop to investigate for drugs did not infringe any of Brown's constitutional rights. We thus affirm the district court's ruling denying Brown's motion to suppress.

**Court of Appeals Decision Affirmed; District Court Suppression Ruling Affirmed.**